IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JEFFREY FOGG, )
)
      Petitioner, )
)
v. ) Civ. A. No. 03-558-KAJ
)
THOMAS CARROLL, Warden, and )
ATTORNEY GENERAL OF THE )
STATE OF DELAWARE, )
)
      Respondents. )

**MEMORANDUM OPINION**

---

Jeffrey Fogg. *Pro se* Petitioner.

Thomas E. Brown, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware. Attorney for Respondents.

---

December 14, 2006
Wilmington, Delaware


JORDAN, District Judge

## I. INTRODUCTION

Petitioner Jeffrey Fogg ("Fogg") is an inmate in custody at the Delaware Correctional Center in Smyrna, Delaware. Fogg filed a habeas Petition in June 2003, and then he filed an Amended Petition in May 2006. (D.I. 2; D.I. 64.) For the reasons that follow, I conclude that equitable tolling is warranted, and therefore, Fogg's Amended Petition is not barred by the one-year period of limitations prescribed in 28 U.S.C. § 2244(d)(1). The State shall file a Response to Fogg's Amended Petition. (D.I. 64.)

## II. FACTUAL AND PROCEDURAL BACKGROUND

As reported by the Delaware Supreme Court on direct appeal, the facts of Fogg's case are as follows:

> On April 4, 1995, there was a party at 407 7th Street, Holloway Terrace, the residence of Daryl "Babe" Andrus. John "Dwayne" Cathell brought over a case of beer around noon and sat on the porch drinking with Andrus and two other men. Fogg arrived around 2:30 p.m. with a 12-pack of beer and Cheryl Adams. James "JD" Dilley ("Dilley") was there also. Dilley and Andrus had been friends for years, although two weeks earlier Andrus had severely beaten Dilley on the face. Dilley was a small man, weighing about 150 pounds and five feet three inches tall. He had a clawed right hand.
>
> The party migrated from the front porch to the back where Fogg provoked Cathell into fighting by kicking Cathell's leg and knocking his hat off. Subsequently, the party moved down to the basement where Cathell and Fogg fought again. Dilley got between the two men, but Andrus hit Dilley out of the way and broke up the fight.
>
> Around 8:00 p.m., Andrus, Fogg and Adams went to a tavern. They stayed there for about an hour and a half. According to Adams, Fogg and Andrus were rowdy and excited from the drinking and earlier fighting.

1

On their way back to Andrus's residence, they stopped at a liquor store. They arrived at Holloway Terrace at approximately 10:00 or 10:30 p.m. Dilley was there. When Adams left approximately 20 minutes later, only three people remained in the dwelling: Dilley, who was in the living room trying to get a fire started in a wood stove, and Andrus and Fogg, who were in the kitchen pouring glasses of black sambucca.

The next morning at approximately 7:30 a.m., an ambulance from the local fire company responded to 407 7th Street. When they arrived on the scene, Fogg directed them inside where they found a body wearing boxer shorts and socks. There was blood all over the walls and carpets of the house. Fogg started mouth-to-mouth resuscitation while the emergency medical technicians began CPR compressions. Fogg told them, "I don't understand what happened, we were talking to him this morning."

A short time later, paramedics arrived. Andrus directed them to the victim. Examining Dilley, the paramedics found signs of rigor mortis in the jaw and finger and no pulse. CPR was discontinued and Dilley was pronounced dead at 7:42 a.m.

When Officer Romi Allen of the New Castle County Police Department arrived, the paramedics informed Allen that this was a crime scene. The victim's face was a bloody pulp. As described by the medical examiner at trial, Dilley had suffered multiple severe injuries caused by "kicking, punching, stomping and striking or being struck with blunt objects as well as hands and shod feet," to the extent that some of these actions left imprints on his body. The injuries to his face were so severe that his nose was torn away from his cheek and his ears were torn away from the back of his head. A false plate inside his mouth was broken into multiple pieces because he had been kicked. The hyoid bone underneath his chin was fractured. According to the medical examiner, Dilley died as a result of extreme blood loss complicated by the inhalation of blood and vomit into his airway.

After inspecting the residence, Officer Allen separated Fogg and Andrus since they were possible witnesses. Allen asked Fogg to have a seat in the police vehicle. When a second officer arrived at the scene, Andrus was placed in the second vehicle.

Detective Quinton Watson of the New Castle County Police Department arrived at approximately 8:30 a.m. He spoke with Fogg who was seated in the back seat of the patrol vehicle. Fogg told Watson that the previous evening, after Adams had brought the women back to Andrus's residence, he had come inside and "crashed on the couch." He was awakened in the morning by Andrus calling his name from the hallway outside the bathroom. He went to the bathroom and saw Dilley lying face up in the bathtub, cold and bloody. Fogg and Andrus pulled

him out of the tub and dragged him by the arms to Andrus' bedroom. They put blankets and a heater next to him. Andrus started mouth-to-mouth resuscitation. Then Andrus went across the street to call for an ambulance. Fogg continued to perform mouth-to-mouth breathing on Dilley who was making gurgling sounds.

Shortly thereafter, the police then transported Andrus and Fogg to police headquarters for more questioning. Andrus was arrested and charged with hindering prosecution. In his final interview which started at 8:40 p.m., Fogg admitted to the police that he had struck Dilley with his hand. Fogg was arrested and charged with first degree murder and hindering prosecution. On May 1, 1995, Andrus and Fogg were jointly indicted on charges of Murder in the First Degree and Conspiracy in the First Degree.

While Andrus and Fogg were at police headquarters being questioned, other police officers were gathering evidence inside the Andrus residence. The living room wall facing the front door had what the police described as an enormous amount of blood on it. The floor was stained with apparent blood, as were the hallway and walls leading to the back of the residence. Similar stains were found on the refrigerator door in the kitchen and on the venetian blinds, sink, and shower in the bathroom. The bathtub was three-quarters filled with red-brown water and numerous items were floating in it, including a pillow, beer can, and shampoo containers. A pair of black boots was discovered in the living room and a pair of cowboy boots and a single black boot were located in the bedroom a few feet away from the body. The police found pieces of broken denture in the bathtub, on the living room floor, and on the bedroom floor next to the victim's body. A tooth was located in the hallway. A pair of wet and bloody jeans was found on the door handle of a second bedroom, and a wet shirt and sock were discovered outside the basement on the ground. On the back deck, the police found a t-shirt, lamp base, and a comforter stained with blood that DNA analysis later matched to Dilley.

The day following the defendant's arrests, the Medical Examiner's Office called the police to ask whether any jewelry had been seized at the scene or from the defendants. The police provided the Medical Examiner with a wizard ring belonging to Andrus, Fogg's ring that had on it a skull's face wearing a Viking helmet, and also several pairs of boots. At trial, the Assistant Medical Examiner, Dr. Adrienne Perlman, testified that Dilley had very distinct "patterned injuries" on his body. She ultimately identified four distinct "patterned injuries" that were caused by the defendants' rings, and the cowboy boots and single black boot recovered from Andrus's bedroom. The cowboy boots, State's Exhibit No. 74, were later identified by a podiatrist as matching casts of Andrus's feet. Dr. Perlman also stated that one ring had to have had a stone in it to have caused the "patterned injuries" she saw on Dilley's body, even though when she saw the ring, the stone was missing.

3

> On April 5, 1995, the police had observed fingerprints, smears and palm prints in reddish-brown stains on the south wall of the living room. Corporal Ronald Webb lifted several palm prints off that wall, the east wall at the corner of the hallway, and from the outside of the door of the master bedroom. At trial, he testified that the ten palm prints that were of value for identification purposes belonged to Andrus and Fogg.
>
> Robert Richmond, an inmate at the Delaware Correctional Center, was called as a witness by the State. Richmond testified that he had met Andrus at Gander Hill. Andrus had told Richmond about his crime, stating that the victim, who lived with Andrus, had slapped Andrus in the face and that Andrus had started fighting. The victim fell to the floor, and Andrus and the co-defendant, who was staying there at the time, kicked and stomped the victim. Andrus said the he had hit the man in the face and apparently was concerned that his ring, which was taken from him by the police, would match 17 cuts to the man's face. According to Richmond, Andrus had claimed that his co-defendant, whose name Richmond did not remember, had gotten carried away with the beating and went too far. The incident took place in the living room and afterward, they dragged the victim to the bathroom. Their main concern was to clean up the house. They had plans of getting rid of the body, but too many people knew that Dilley had been there and that they had been fighting. Andrus told Richmond that he went to bed and, the next morning after sobering up, he called 911.
>
> The defense for Andrus presented evidence that he had sustained a gunshot wound in 1994 that had left him partially paralyzed on his right side and in his left leg. He would not have been able to kick with any force, although he could have performed some of the injuries described in the autopsy such as punching and striking with blunt objects or hands. Neither Andrus nor Fogg testified at trial.

*Fogg v. State*, 719 A.2d 947 (Table), 1998 WL 736331 (Del. Oct. 1, 1998).

On May 3, 1996, a Delaware Superior Court jury found Fogg and Andrus guilty of first degree murder and first degree conspiracy. The Superior Court sentenced Fogg to a mandatory term of life imprisonment without the benefit of probation or parole for the murder conviction, and to five years in prison, suspended after four years for probation, for the conspiracy conviction. *Id.* at *1.

Fogg filed a direct appeal, raising two issues. The Delaware Supreme Court *sua sponte* identified a third issue under *Bruton v. United States*, 391 U.S. 123 (1968), and

requested supplemental memoranda regarding certain out-of-court statements made by Andrus and the effect of admitting those statements at Fogg's trial. After reviewing the supplemental memoranda, the Delaware Supreme Court remanded the issue to the Superior Court to reconsider its pre-trial decision not to sever the joint trial under *Bruton* and its progeny. On February 20, 1998, the Delaware Superior Court submitted a 15-page report detailing its findings on remand. The Superior Court explained that severing the joint trial would not have been the proper remedy; instead, Andrus' statement could have been redacted to eliminate any reference to Fogg. On October 1, 1998, the Delaware Supreme Court affirmed Fogg's conviction and sentence, explaining that the admission of Andrus' statement was contrary to *Bruton*, but that the *Bruton* error was harmless when considered in context of the admissible evidence of Fogg's guilt. *Fogg v. State*, 719 A.2d 947 (Table), 1998 WL 736331, at *4 (Del. Oct. 1, 1998).

On September 30, 1999, Fogg filed a motion for state post-conviction relief pursuant to Delaware Superior Court Criminal Rule 61 ("Rule 61 motion"). The Superior Court summarily dismissed several claims raised in the Rule 61 motion as procedurally barred, and denied the remaining ineffective assistance of counsel claims as meritless. *State v. Fogg*, 2000 WL 1211510 (Del. Super. Ct. Aug. 1, 2000). On appeal, the Delaware Supreme Court determined that the record was not sufficiently developed insofar as the claims for ineffective assistance of counsel and remanded the matters to the Superior Court for further development of the record. The Superior Court conducted an evidentiary hearing and concluded that Fogg did not demonstrate that his

counsel was ineffective. *State v. Fogg*, 2002 WL 31053868 (Del. Super. Ct. Sept. 10, 2002). On December 23, 2002, the Delaware Supreme Court affirmed the Superior Court's decision. *Fogg v. State*, 817 A.2d 804 (Table), 2002 WL 31873705 (Del. Dec. 23, 2002). Fogg filed a motion for re-argument, which the Delaware Supreme Court denied on March 4, 2003. (D.I. 89, Del. Sup. Ct. Dkt. in No.426,2000, at Entry No. 78.)

Fogg filed a Petition for habeas corpus relief pursuant to § 2254 on June 13, 2003. In August 2003, Fogg filed a Motion to Amend the petition by adding a *Brady* claim. The State filed an Answer to the Petition in November 2003. (D.I. 18; D.I. 25.)

Sometime in January 2004, Fogg's counsel passed away.[1] Fogg then filed several letters and two motions outlining his efforts to find another attorney to represent him in this habeas proceeding. Fogg appeared to be concerned with the fact that he had not filed a reply to the State's answer. (D.I. 26.)

In March 2005, Fogg filed a Motion to Stay his habeas proceeding in order to enable him to find a new attorney. (D.I. 32.) In July 2005, Fogg filed another Motion to Stay the proceeding, re-asserting his desire to retain a new attorney and also arguing that a stay was necessary because he was seeking DNA testing of the "black boot" in order to establish his innocence.[2] (D.I. 32.) In a Memorandum Order dated August 26, 2005, I denied Fogg's Motions to Stay the proceeding without prejudice. (D.I. 37.) I also determined, *sua sponte*, that the Petition was time-barred, and I afforded the State

---

[1] Counsel represented Fogg through the final stages of his state collateral proceeding as well as the first 6 months of the instant proceeding.

[2] Fogg's Amended Petition does not raise a claim of actual innocence based on any DNA testing of the black boot. Additionally, Fogg has not indicated if the DNA testing he was pursuing was ever conducted.

and Fogg an opportunity to address whether Fogg's Petition should be subject to equitable tolling.

The State filed a Response, agreeing that the Petition should be denied as time-barred. (D.I. 41.)  In November 2005, Fogg filed a Motion to Amend his Petition. I granted that Motion, and Fogg filed an Amended Petition in May 2006 asserting a total of 14 claims. (D.I. 52; D.I. 53; D.I. 64.)  I issued an Order directing Fogg to respond to the limitations issue. (D.I. 80.)  In August 2006, Fogg filed a document titled "Response to Court's 7/14/06 Order Regarding the Timeliness of 2254 Petition." (D.I. 87.)

Fogg filed two Motions to Expand the Record with documents filed in his state proceedings and copies of letters. (D.I. 75; D.I. 88.)  I will grant those Motions, and refer to any relevant documents in my review of Fogg's habeas Amended Petition.

Fogg's Amended Petition, which I will refer to as his "Petition" from this point forward, is now ready for review.[3]

## III.  DISCUSSION

I will briefly summarize my prior Memorandum Order of August 2005, in which I determined that Fogg's Petition is time-barred, unless the limitations period is subject to equitable tolling.

Pursuant to 28 U.S.C. § 2244(d)(1)(A), AEDPA's one-year limitation period begins to run from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." In Fogg's case, the Delaware Supreme Court affirmed Fogg's conviction and sentence on October 1, 1998,

---

[3] Additionally, after filing his Amended Petition, Fogg filed two Motions to Expand the Record. (D.I. 75; D.I. 88.) I grant these Motions in my accompanying Order.

and he did not seek certiorari review. Using October 1, 1998 as the relevant starting date from which to calculate the 90-day certiorari period, I concluded that Fogg's conviction became final on December 30, 1998. To be timely, Fogg's Petition for habeas relief had to have been filed by the end of December, 1999. Fogg did not file his Petition until June 13, 2003. Therefore, I concluded that the Petition was time-barred unless the limitations period could be statutorily or equitably tolled.

I then explained that, if applicable, § 2244(d)(2)'s provision for statutory tolling could extend the filing deadline. Fogg filed his Rule 61 motion on September 30, 1999, which was denied by the Superior Court. The Delaware Supreme Court affirmed the Superior Court's judgment on December 23, 2002. Fogg filed a motion for re-argument, which the Delaware Supreme Court denied on March 4, 2003. Based on the foregoing, I explained that the Rule 61 motion statutorily tolled the limitations period from September 30, 1999 through March 4, 2003, and that the limitations period started to run again on March 5, 2003.[4] However, because 274 days of AEDPA's limitations period had already expired when Fogg filed his Rule 61 motion, there were only 91 days remaining in the limitations period when the limitations clock started to run again

---

[4] At the end of May or the beginning of June, 2003, Fogg's counsel applied to the United States Supreme Court for an extension of time to file a petition for a writ of certiorari regarding the denial of Fogg's Rule 61 motion, and the application was denied on June 5, 2003. (D.I. 87, at Exh. B) The limitations period is not tolled during the pendency of a prisoner's petition for a writ of certiorari to the United States Supreme Court when the request concerns the denial of his state post-conviction or collateral proceeding. *Miller v. Dragovich*, 311 F.3d 574, 577-81 (3d Cir. 2002); *see also Stokes v. Dist. Attorney of County of Philadelphia*, 247 F.3d 539, 542 (3d Cir. 2001); *LaCava v. Kyler*, 398 F.3d 271, 274 (3d Cir. 2005). Thus, Fogg's application for an extension of time to file a certiorari petition does not toll the limitations period.

on March 5, 2003. In short, the deadline for filing a timely petition was June 3, 2003. Thus, even with statutory tolling, Fogg filed his Petition 10 days too late.

I then asked both parties to address whether Fogg's untimely Petition was subject to equitable tolling. The State filed a Response arguing that equitable tolling is inappropriate in Fogg's case, and Fogg argues that I should equitably toll the limitations period. Fogg also contends that I incorrectly calculated the date on which his conviction became final as well as the date on which the statutory tolling ended, which he alleges caused me to erroneously conclude that his Petition is time-barred. I will discuss the issues separately.

### A.     Finality and Statutory Tolling Determinations

Fogg concedes that he did not file a petition for certiorari review after his direct appeal. Fogg also concedes that AEDPA's limitations period began upon the expiration of the 90-day certiorari filing period. However, because the Delaware Supreme Court did not issue its mandate until October 19, 1998, Fogg contends that I erroneously used October 1, 1998, the date the Delaware Supreme Court entered its decision, as the date from which to calculate the 90-day certiorari period. Citing to Delaware Superior Court Criminal Rule 61(m)(2),[5] Fogg argues that his conviction did not become final for the purposes of state post-conviction review until the Delaware Supreme Court issued its mandate on October 19, 1998, and therefore, October 19, 1998 is the proper date to use in calculating the finality of his conviction under § 2244(d)(1).

---

[5]Delaware Superior Court Criminal Rule 61(m)(2) provides that a judgment of conviction is final for the purposes of Delaware's post-conviction relief when the Delaware Supreme Court issues a mandate on direct appeal.

9

Fogg's argument is unavailing. According to the United States Supreme Court, "[t]he words 'by the conclusion of direct review or the expiration of the time for seeking such review' make it clear that finality for the purpose of § 2244(d)(1)(A) is to be determined by reference to a uniform federal rule," and the uniform federal rule is United States Supreme Court Rule 13(3). *Clay v. United States*, 537 U.S. 522, 527, 530 (2003). Pursuant to Rule 13(3), "[t]he time to file a petition for a writ of certiorari runs from the date of entry of the judgment or order sought to be reviewed, and not from the issuance date of the mandate (or its equivalent under local practice)," and the date on which the judgment is entered is not included in calculating the 90-day period. *See* Sup. Ct. R. 13(3); Sup. Ct. R. 30(1). Thus, I correctly concluded that Fogg's conviction became final on December 30, 1998.

Fogg also contends that I erred in calculating the last day of statutory tolling under § 2244(d)(2). More specifically, I determined that Fogg's Rule 61 motion tolled the limitations period through March 4, 2003, the day on which the Delaware Supreme Court denied Fogg's motion for re-argument in his state collateral proceeding. However, although the Delaware Supreme Court entered its decision on March 4, 2003, that court did not issue its mandate until March 7, 2003.[6] Thus, Fogg contends that I should have used March 7, 2003, the date on which the mandate was issued, as the ending point for statutory tolling.

---

[6] I was not aware that the Delaware Supreme Court issued a separate mandate on March 7, 2003 until Fogg provided a copy of the pertinent docket sheet. *See* (D.I. 89, Del. Sup. Ct. Dkt. in No. 426,2000, at Entry No. 78.)

According to the United States Court of Appeals for the Third Circuit, if a petitioner timely files a motion for reconsideration or re-argument of a state supreme court's decision in a state collateral proceeding, then the initial post-conviction motion is "pending" for statutory tolling purposes until the state supreme court "decides" the motion for re-argument or reconsideration. See Nara v. Frank, 264 F.3d 310, 319 (3d Cir. 2001), overruling on other grounds recognized by Satterfield v. Johnson, 434 F.3d 185, 194 (3d Cir. 2006). The Third Circuit has also explained that state law, and not federal law, determines if a state post-conviction application is "properly filed" for statutory tolling purposes. Lovasz v. Vaughn, 134 F.3d 146, 148 (3d Cir. 1998). Unfortunately, however, neither of those opinions address the precise issue before me, namely, whether a motion for re-argument in a state supreme court is "decided" for statutory tolling purposes upon entry of the state supreme court's judgment or upon issuance of a mandate.[7] Given this uncertainty, I will presume that Fogg's Rule 61 motion tolled the limitations period through March 7, 2003, the date on which the Delaware Supreme Court issued its mandate.

At this point, I will make one more change to my original analysis of the limitations issue. In my August 2005 Memorandum Order, I determined that 274 days of AEDPA's limitations period had already expired when Fogg filed his Rule 61 motion, leaving 91 days left in the limitations period when the limitations clock began to run after

---

[7]The Third Circuit opinions also do not explain whether that determination is governed by state or federal law. The Third Circuit has granted a certificate of appealability to determine whether state law or federal law governs the calculation of the starting point for statutory tolling under § 2244(d)(2). Austin v. Carroll, Civ. A. No. 04-3811, Order (3d Cir. Jan. 3. 2005).

the last day of statutory tolling. I made that calculation by including December 30, 1998, the day on which Fogg's conviction became final, as the first day of the limitations period. Since I issued that August 2005 decision, the Third Circuit has held that Federal Rule of Civil Procedure 6(a) governs the computation of AEDPA's limitations period, meaning that the limitations begins to run on the day after the conviction becomes final. *See Wilson v. Beard*, 426 F.3d 653, 662-63 (3d Cir. 2005). The significance of this change for Fogg is that December 30, 1998 should not be included in the one-year calculation. Therefore, when Fogg filed his Rule 61 motion, 273 days (not 274 days) of AEDPA's limitations had expired, leaving Fogg 92 days (not 91 days) to timely file a petition once statutory tolling ended.

The limitations clock started to run again on March 8, 2003,[8] and ran for 92 days without interruption until it ended on June 7, 2003. However, because June 7, 2003 fell on a Saturday, Fogg had until Monday June 9, 2003 to timely file his petition. *See* Fed. R. Civ. P. 6(a). Fogg filed the Petition on June 13, 2003, 4 days too late. Thus, the Petition is time-barred, unless equitable tolling is warranted.

### B. Equitable Tolling

In order to trigger equitable tolling, a habeas petitioner must demonstrate that he "exercised reasonable diligence in investigating and bringing [the] claims" and that he was prevented from asserting his rights in some extraordinary way; mere excusable neglect is insufficient. *Miller v. New Jersey State Dep't of Corrections*, 145 F.3d 616,

---

[8]Pursuant to federal and state rules, the day on which statutory tolling ended (March 7, 2003) is excluded from the computation of the remaining time in the limitations period. *See* Fed. R. Civ. P. 6(a); Del. Sup. Ct. R. 11(a).

12

618-19 (3d Cir. 1998)(citations omitted); *Schlueter v. Varner*, 384 F.3d 69, 76-77 (3d Cir. 2004). Consistent with these principles, the Third Circuit has specifically limited equitable tolling of AEDPA's limitations period to the following circumstances:

> (1) where the defendant actively misled the plaintiff;
> (2) where the plaintiff was in some extraordinary way prevented from asserting his rights; or
> (3) where the plaintiff timely asserted his rights mistakenly in the wrong forum.

*Jones v. Morton*, 195 F.3d 153, 159 (3d Cir. 1999).

The first issue I need to determine in the equitable tolling inquiry is whether Fogg exercised reasonable diligence in pursuing his claims. When, as here, the petitioner was represented by counsel, factors to consider in the diligence inquiry include: (1) whether the petitioner hired an attorney to file the petition; (2) whether the petitioner contacted the attorney prior to the filing deadline; and (3) whether the petitioner consistently called the attorney to monitor the status of his case. *See Schlueter v. Varner*, 384 F.3d 69, 83 (3d Cir. 2004).

Here, the record reveals that Fogg actually hired different attorneys during different stages of his state collateral proceeding. Counsel who filed the Petition started representing Fogg during his post-conviction appeal in state court, and, because Fogg was satisfied with counsel's performance, Fogg asked her to continue the representation during his pursuit of federal habeas relief. Counsel represented Fogg through the first 6 months of this proceeding until she died in January 2004. The record also reveals that Fogg consistently contacted counsel to monitor his case. In fact, Fogg assisted counsel in the preparation of his § 2254 petition. Based on these facts, I conclude that Fogg exercised reasonable diligence in bringing his claims.

The next issue is whether the fatal illness of Fogg's counsel constitutes an extraordinary circumstance for equitable tolling purposes. As an initial matter, I agree with Fogg's contention that the crucial period for this portion of the inquiry extends from March 8, 2003 through June 9, 2003,[9] the period of time in which a timely habeas petition could have been filed. Fogg argues that counsel's illness during this period prevented her from timely filing the Petition, and he has filed several letters he received from counsel to support his argument.[10]

A quick overview of counsel's letters reveals the following facts. After the Delaware Supreme Court denied Fogg's motion for re-argument with respect to his Rule 61 motion, counsel started pursuing certiorari review in the United States Supreme Court. In one letter, counsel identified June 2, 2003 as the last date on which she could file a petition for a writ of certiorari with respect to the denial of Fogg's state post-conviction motion. (D.I. 47, Exh. B at No. 42.) Counsel explained that she was preparing a request for an extension of time to file a petition for a writ of certiorari on May 22, 2003, and that she express mailed the request to the United States Supreme Court on May 28, 2003. *Id.* at Nos. 41, 42.

---

[9]Fogg identifies the crucial period as the time-period from March 7, 2003 through June 2, 2003. However, considering the calculation changes explained in the text of the opinion, I will view the crucial period he asserts as extending from March 8, 2003 through June 9, 2003.

[10]Fogg also argues that the other attorney in his counsel's office refused to help counsel with Fogg's case. However, because Fogg had not retained the other attorney to represent him, I do not consider that attorney's "failure" to help an issue for consideration in my equitable tolling analysis.

The letters also reveal that the Supreme Court denied the request, and notified counsel's office of the denial in a letter dated June 5, 2003. *Id.* at No.43. Counsel's office received the letter on June 9, 2003, and another attorney in counsel's office informed her about the denial. Counsel then filed Fogg's Petition on June 13, 2003, a mere 4 days after being notified of the Supreme Court's decision. *Id.* at No. 43.

Based on the contents of the letters, one could reasonably conclude that counsel's late filing was either the result of a mathematical mistake or the result of an erroneous belief that the limitations period was statutorily tolled during the period she was seeking an extension of time to file a petition for a writ of certiorari in the United States Supreme Court.[11] Considering that the Third Circuit has repeatedly held that, in non-capital cases, attorney error does not warrant equitable tolling, I could therefore decline to equitably toll the limitations period. *See Schlueter*, 384 F.3d at 76; *Johnson v. Hendricks*, 314 F.3d 159, 163 (3d Cir. 2002). However, for the following reasons, I conclude that the limitations period should be equitably tolled in the peculiar situation presented here.

In *Doherty v. Teamsters Pension Trust Fund,* 16 F.3d 1386, 1393-94 (3d Cir. 1994), the Third Circuit recognized that equitable tolling may be warranted where an attorney commits a mistake during the proceedings and the mistake was due to the extreme duress caused by the attorney's illness. After thoroughly reviewing the record,

---

[11]The time for seeking certiorari review from a state collateral proceeding does not toll AEDPA's limitations period. *See Miller v. Dragovich*, 311 F.3d 574, 577-81 (3d Cir. 2002); *see also Stokes v. Dist. Attorney of County of Philadelphia*, 247 F.3d 539, 542 (3d Cir. 2001); *LaCava*, 398 F.3d at 274.

I conclude that, to the extent counsel's late filing was due to a mistake, that mistake was caused by the duress of her illness, which took her life soon after the Petition was filed. I underscore the fact that my decision to equitably toll the limitations period in Fogg's case is extremely fact specific. The record reveals that counsel suffered at least one stroke during the course of her representation of Fogg. Statements in counsel's letters indicate that she was undergoing medical treatment during the period from March 2003 through June 2003. The letters indicate that counsel was facing the most severe and distracting distress. If counsel were still living, she could explain the situation. Unfortunately, however, she passed away a few months after filing Fogg's Petition. Considering the length of Fogg's relationship with counsel, her diligent pursuit of Fogg's claims, Fogg's own diligence in pursuing his claims, counsel's progressively debilitating illness, and the short 4 day period by which counsel missed the deadline, I conclude that Fogg's case presents an extraordinary situation in which equitable tolling is proper and in the interest of justice.

Accordingly, I conclude that Fogg's Petition is not time-barred.

## IV.   CONCLUSION

For the reasons stated, I conclude that Fogg's Petition for habeas relief pursuant to 28 U.S.C. § 2254 is not time-barred. I will enter an appropriate Order directing the State to file an Answer to Fogg's Petition.