## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JEFFREY FOGG, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Civ. No. 03-558-SLR |
| | ) |
| PERRY PHELPS, Warden, and | ) |
| ATTORNEY GENERAL OF THE | ) |
| STATE OF DELAWARE, | ) |
| | ) |
| Respondents.[1] | ) |

## MEMORANDUM OPINION[2]

Jeffrey Fogg. Pro se petitioner.

Kevin M. Carroll, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware. Attorney for respondents.

September 3o , 2008
Wilmington, Delaware

---

[1] Warden Perry Phelps assumed office in January 2008, replacing warden Thomas Carroll, an original party to this case. *See* Fed. R. Civ. P. 25(d)(1).

[2] This case was re-assigned from the Vacant Judgeship to the undersigned on February 1, 2008.

**ROBINSON, District Judge**

## I. INTRODUCTION

Petitioner Jeffrey Fogg ("petitioner") is an inmate in custody at the James T.

Vaughn Correctional Center in Smyrna, Delaware. Petitioner filed a habeas application

in June 2003, an amended application in May 2006, and a second amended application

in August 2007. (D.I. 2 D.I. 64; D.I. 105) Petitioner asks the court to review the

claims asserted in the second amended application. For the reasons that follow, the

court concludes that the application does not warrant relief.

## II. FACTUAL AND PROCEDURAL BACKGROUND

As reported by the Delaware Supreme Court on direct appeal, the facts of

petitioner's case are as follows:

On April 4, 1995, there was a party at 407 7th Street, Holloway Terrace, the residence of Daryl "Babe" Andrus. John "Dwayne" Cathell brought over a case of beer around noon and sat on the porch drinking with Andrus and two other men. [Petitioner] arrived around 2:30 p.m. with a 12-pack of beer and Cheryl Adams. James "JD" Dilley ("Dilley") was there also. Dilley and [Andrus] had been friends for years, although two weeks earlier Andrus had severely beaten Dilley on the face. Dilley was a small man, weighing about 150 pounds and five feet three inches tall. He had a clawed right hand.

The party migrated from the front porch to the back where [petitioner] provoked Cathell into fighting by kicking Cathell's leg and knocking his hat off. Subsequently, the party moved down to the basement where Cathell and [petitioner] fought again. Dilley got between the two men, but Andrus hit Dilley out of the way and broke up the fight.

Around 8:00 p.m., Andrus, [petitioner] and Adams went to a tavern. They stayed there for about an hour and a half. According to Adams, [petitioner] and Andrus were rowdy and excited from the drinking and earlier fighting.

On their way back to Andrus's residence, they stopped at a liquor store. They arrived at Holloway Terrace at approximately 10:00 or 10:30 p.m. Dilley was there. When Adams left approximately 20 minutes later, only three people remained in the dwelling: Dilley, who was in the living room trying to get a fire

started in a wood stove, and Andrus and [petitioner], who were in the kitchen pouring glasses of black sambucca.

The next morning at approximately 7:30 a.m., an ambulance from the local fire company responded to 407 7th Street. When they arrived on the scene, [petitioner] directed them inside where they found a body wearing boxer shorts and socks. There was blood all over the walls and carpets of the house. [Petitioner] started mouth-to-mouth resuscitation while the emergency medical technicians began CPR compressions. [Petitioner] told them, "I don't understand what happened, we were talking to him this morning."

A short time later, paramedics arrived. Andrus directed them to the victim. Examining Dilley, the paramedics found signs of rigor mortis in the jaw and finger and no pulse. CPR was discontinued and Dilley was pronounced dead at 7:42 a.m.

When Officer Romi Allen of the New Castle County Police Department arrived, the paramedics informed Allen that this was a crime scene. The victim's face was a bloody pulp. As described by the medical examiner at trial, Dilley had suffered multiple severe injuries caused by "kicking, punching, stomping and striking or being struck with blunt objects as well as hands and shod feet," to the extent that some of these actions left imprints on his body. The injuries to his face were so severe that his nose was torn away from his cheek and his ears were torn away from the back of his head. A false plate inside his mouth was broken into multiple pieces because he had been kicked. The hyoid bone underneath his chin was fractured. According to the medical examiner, Dilley died as a result of extreme blood loss complicated by the inhalation of blood and vomit into his airway.

After inspecting the residence, Officer Allen separated [petitioner] and Andrus since they were possible witnesses. Allen asked [petitioner] to have a seat in the police vehicle. When a second officer arrived at the scene, Andrus was placed in the second vehicle.

Detective Quinton Watson of the New Castle County Police Department arrived at approximately 8:30 a.m. He spoke with [petitioner] who was seated in the back seat of the patrol vehicle. [Petitioner] told Watson that the previous evening, after Adams had brought the []men back to Andrus's residence, he had come inside and "crashed on the couch." He was awakened in the morning by Andrus calling his name from the hallway outside the bathroom. He went to the bathroom and saw Dilley lying face up in the bathtub, cold and bloody. [Petitioner] and Andrus pulled him out of the tub and dragged him by the arms to Andrus' bedroom. They put blankets and a heater next to him. Andrus started mouth-to-mouth resuscitation. Then Andrus went across the street to call for an

2

ambulance. [Petitioner] continued to perform mouth-to-mouth breathing on Dilley who was making gurgling sounds.

Shortly thereafter, the police then transported Andrus and [petitioner] to police headquarters for more questioning. Andrus was arrested and charged with hindering prosecution. In his final interview which started at 8:40 p.m., [petitioner] admitted to the police that he had struck Dilley with his hand. [Petitioner] was arrested and charged with first degree murder and hindering prosecution. On May 1, 1995, Andrus and [petitioner] were jointly indicted on charges of Murder in the First Degree and Conspiracy in the First Degree.

While Andrus and [petitioner] were at police headquarters being questioned, other police officers were gathering evidence inside the Andrus residence. The living room wall facing the front door had what the police described as an enormous amount of blood on it. The floor was stained with apparent blood, as were the hallway and walls leading to the back of the residence. Similar stains were found on the refrigerator door in the kitchen and on the venetian blinds, sink, and shower in the bathroom. The bathtub was three-quarters filled with red-brown water and numerous items were floating in it, including a pillow, beer can, and shampoo containers. A pair of black boots was discovered in the living room and a pair of cowboy boots and a single black boot were located in the bedroom a few feet away from the body. The police found pieces of broken denture in the bathtub, on the living room floor, and on the bedroom floor next to the victim's body. A tooth was located in the hallway. A pair of wet and bloody jeans was found on the door handle of a second bedroom, and a wet shirt and sock were discovered outside the basement on the ground. On the back deck, the police found a t-shirt, lamp base, and a comforter stained with blood that DNA analysis later matched to Dilley.

The day following the defendants' arrests, the Medical Examiner's Office called the police to ask whether any jewelry had been seized at the scene or from the defendants. The police provided the Medical Examiner with a wizard ring belonging to Andrus, [petitioner]'s ring that had on it a skull's face wearing a Viking helmet, and also several pairs of boots. At trial, the Assistant Medical Examiner, Dr. Adrienne Perlman, testified that Dilley had very distinct "patterned injuries" on his body. She ultimately identified four distinct "patterned injuries" that were caused by the defendants' rings, and the cowboy boots and single black boot recovered from Andrus's bedroom. The cowboy boots, State's Exhibit No. 74, were later identified by a podiatrist as matching casts of Andrus's feet. Dr. Perlman also stated that one ring had to have had a stone in it to have caused the "patterned injuries" she saw on Dilley's body, even though when she saw the ring, the stone was missing.

On April 5, 1995, the police had observed fingerprints, smears and palm prints in reddish-brown stains on the south wall of the living room. Corporal Ronald

3

Webb lifted several palm prints off that wall, the east wall at the corner of the hallway, and from the outside of the door of the master bedroom. At trial, he testified that the ten palm prints that were of value for identification purposes belonged to Andrus and [petitioner].

Robert Richmond, an inmate at the Delaware Correctional Center, was called as a witness by the State. Richmond testified that he had met Andrus at Gander Hill. Andrus had told Richmond about his crime, stating that the victim, who lived with Andrus, had slapped Andrus in the face and that Andrus had started fighting. The victim fell to the floor, and Andrus and the co-defendant , who was staying there at the time, kicked and stomped the victim. Andrus said that he had hit the man in the face and apparently was concerned that his ring, which was taken from him by the police, would match 17 cuts to the man's face. According to Richmond, Andrus had claimed that his co-defendant, whose name Richmond did not remember, had gotten carried away with the beating and went too far. The incident took place in the living room and afterward, they dragged the victim to the bathroom. Their main concern was to clean up the house. They had plans of getting rid of the body, but too many people knew that Dilley had been there and that they had been fighting. Andrus told Richmond that he went to bed and, the next morning after sobering up, he called 911.

The defense for Andrus presented evidence that he had sustained a gunshot wound in 1994 that had left him partially paralyzed on his right side and in his left leg. He would not have been able to kick with any force, although he could have performed some of the injuries described in the autopsy such as punching and striking with blunt objects or hands. Neither Andrus nor [petitioner] testified at trial.

*Fogg v. State*, 719 A.2d 947 (Table), 1998 WL 736331 (Del. Oct. 1, 1998).

Petitioner filed a pre-trial motion to sever the charges, which the Superior Court

denied. On May 3, 1996, following a joint trial with Andrus and petitioner, a Delaware

Superior Court jury found petitioner and Andrus guilty of first degree murder and first

degree conspiracy. The Superior Court sentenced petitioner to a mandatory term of life

imprisonment without the benefit of probation or parole for the murder conviction, and to

five years in prison, suspended after four years for probation, for the conspiracy

conviction. *Id.* at *1.

4

Petitioner filed a direct appeal, raising two issues: first, that his statements to the police were taken in violation of his *Miranda* rights under the Fifth Amendment, and second, that the Superior Court mistakenly concluded that petitioner's statement to the police was the product of a voluntary, intelligent, and knowing waiver of his *Miranda* rights. The Delaware Supreme Court sua sponte identified a third issue under *Bruton v. United States*, 391 U.S. 123 (1968), and requested supplemental memoranda regarding the out-of-court statements made by Andrus to the prosecution witness named Robert Richmond, and the effect of admitting those statements at petitioner's trial. After reviewing the supplemental memoranda, the Delaware Supreme Court remanded the issue to the Superior Court to reconsider its pre-trial decision not to sever the joint trial under *Bruton* and its progeny. On February 20, 1998, the Delaware Superior Court submitted a fifteen page report detailing its findings on remand. (D.I. 24, *State v. Fogg and Andrus*, Cr. A. Nos. IN95-040725, IN95-05-0007, IN95-04-0927, IN95-05-0006, Finding of Facts and Conclusions of Law (Del. Super. Ct. Feb. 20, 1998)) The Superior Court explained that severing the joint trial would not have been the proper remedy; instead, Andrus' statement could have been redacted to eliminate any reference to petitioner. *Id.* On October 1, 1998, the Delaware Supreme Court affirmed petitioner's conviction and sentence, explaining that the admission of Andrus' statement was contrary to *Bruton*, but that the *Bruton* error was harmless when considered in context of the admissible evidence of petitioner's guilt. *Fogg*, 1998 WL 736331, at *4.

5

On September 30, 1999, petitioner filed in the Delaware Superior Court a motion for state post-conviction relief pursuant to Delaware Superior Court Criminal Rule 61 ("Rule 61 motion"). The Superior Court summarily dismissed several claims raised in the Rule 61 motion as procedurally barred, and denied the remaining ineffective assistance of counsel claims as meritless. *State v. Fogg*, 2000 WL 1211510 (Del. Super. Ct. Aug. 1, 2000). On appeal, the Delaware Supreme Court determined that the record was not sufficiently developed with respect to the claims for ineffective assistance of counsel, and remanded the matters to the Superior Court for further development of the record. The Superior Court conducted an evidentiary hearing and concluded that petitioner failed to demonstrate that his counsel was ineffective. *State v. Fogg*, 2002 WL 31053868 (Del. Super. Ct. Sept. 10, 2002). On December 23, 2002, the Delaware Supreme Court affirmed the Superior Court's decision. *Fogg v. State*, 817 A.2d 804 (Table), 2002 WL 31873705 (Del. Dec. 23, 2002). Petitioner filed a motion for re-argument, which the Delaware Supreme Court denied on March 4, 2003. (D.I. 89, Del. Sup. Ct. Dkt. in No.426,2000, at Entry No. 78.)

Petitioner, represented by counsel, filed an application for habeas corpus relief pursuant to 28 U.S.C. § 2254 on June 13, 2003, and the case was assigned to the Honorable Kent A. Jordan. In August 2003, petitioner filed a motion to amend the application by adding a *Brady* claim. The State filed an answer to the application in November 2003. (D.I. 18; D.I. 25.)

6

Sometime in January 2004, petitioner's federal post-conviction counsel passed away.[3] Petitioner then filed several letters and two motions outlining his efforts to find another attorney to represent him in this habeas proceeding. Petitioner appeared to be concerned with the fact that he had not filed a reply to the State's answer. (D.I. 26.)

In March 2005, petitioner filed a motion to stay his habeas proceeding in order to enable him to find a new attorney. (D.I. 32.) In July 2005, petitioner filed another motion to stay the proceeding, re-asserting his desire to retain a new attorney and also arguing that a stay was necessary because he was seeking DNA testing of the "black boot" in order to establish his innocence. (D.I. 32.) In a Memorandum Order dated August 26, 2005, Judge Jordan denied without prejudice petitioner's motions to stay the proceeding. (D.I. 37.) Judge Jordan also determined, sua sponte, that the application was time-barred, and he afforded the State and petitioner an opportunity to address whether the application should be subject to equitable tolling.

The State filed a response, arguing that equitable tolling was not warranted and, therefore, the application should be denied as time-barred. (D.I. 41.) In November 2005, petitioner filed a motion to amend his application which Judge Jordan granted. Petitioner filed an amended application in May 2006 asserting a total of 14 claims. (D.I. 52; D.I. 53; D.I. 64.) Judge Jordan issued an order directing petitioner to respond to the limitations issue. (D.I. 80.) In August 2006, petitioner filed a document titled "Response to Court's 7/14/06 Order Regarding the Timeliness of 2254 Petition." (D.I. 87.)

---

[3]Counsel represented petitioner through the final stages of his state collateral proceeding as well as the first six months of the instant proceeding.

7

In a Memorandum Opinion signed on December 14, 2006, Judge Jordan held that equitable tolling was warranted in petitioner's case due to post-conviction counsel's severe illness (and subsequent death) following a stroke. *See* (D.I. 93) Judge Jordan then ordered the State to file an answer to petitioner's amended application (D.I. 64) that was filed in May 2006. (D.I. 94) Before the State filed its answer, petitioner filed a document titled second amended application. (D.I. 105) The State did not oppose the amendment, and filed its answer to the second amended application on September 28, 2007. (D.I. 108)

Thereafter, petitioner filed a partial reply brief (D.I. 125) and an oversized reply (D.I. 129) to the State's answer, as well as a motion for an extension of time to file a traverse (D.I. 131). In an order dated August 13, 2008, the court granted petitioner's motion but, after explaining that petitioner seemed to be confused by the terms "traverse" and "reply," limited petitioner's traverse to thirty pages. (D.I. 134) Petitioner then filed a motion to strike (D.I. 136) certain repetitive filings (D.I. 2; D.I. 64; D.I. 73; D.I. 76) and replace them with his second amended application (D.I. 105). He also asked to replace an appendix (D.I. 74) with another appendix (D.I. 89), as well as to replace his partial reply brief (D.I. 125) with his oversized reply filed on June 20, 2008 (D.I. 129). *See* (D.I. 136) Finally, petitioner filed a traverse ninety-two pages long. *See* (D.I. 137)

The court will grant petitioner's motion (D.I. 136) to replace his original and amended applications with his second amended application, (D.I. 105) , and his partial reply brief with his oversized reply (D.I. 129). The court will also consider petitioner's oversized traverse. (D.I. 137)

8

## III. GOVERNING LEGAL PRINCIPLES

### A. Exhaustion and Procedural Default

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may consider a habeas petition filed by a state prisoner only "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). One prerequisite to federal habeas review is that a petitioner must exhaust all remedies available in the state courts. *See* 28 U.S.C. § 2254(b)(1). The exhaustion requirement is grounded on principles of comity to ensure that state courts have the initial opportunity to review federal constitutional challenges to state convictions. *Werts v. Vaughn,* 228 F.3d 178, 192 (3d Cir. 2000).

A petitioner satisfies the exhaustion requirement by "fairly presenting" the substance of the federal habeas claim to the state's highest court, either on direct appeal or in a post-conviction proceeding, and in a procedural manner permitting the state courts to consider it on the merits. *See Duncan v. Henry,* 513 U.S. 364, 365 (1995); *Castille v. Peoples,* 489 U.S. 346, 351 (1989); *Lambert v. Blackwell,* 134 F.3d 506, 513 (3d Cir. 1997). If the petitioner fairly presents a federal habeas claim to the state's highest court, but that court "clearly and expressly" refuses to review the merits of the claim due to an independent and adequate state procedural rule, the claim is exhausted but procedurally defaulted. *See Coleman v. Thompson,* 501 U.S. 722, 750 (1991)*; Harris v. Reed,* 489 U.S. 255, 260-64 (1989).

A federal court cannot review the merits of procedurally defaulted claims unless the petitioner demonstrates either cause for the procedural default and actual prejudice

9

resulting therefrom, or that a fundamental miscarriage of justice will result if the court does not review the claims. *McCandless v. Vaughn*, 172 F.3d 255, 260 (3d Cir. 1999); *Coleman*, 501 U.S. at 750-51; *Caswell v. Ryan*, 953 F.2d 853, 861-62 (3d Cir. 1992). To demonstrate cause for a procedural default, the petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To demonstrate actual prejudice, the petitioner must show that the errors during his trial worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494.

Alternatively, if the petitioner demonstrates that a "constitutional violation has probably resulted in the conviction of one who is actually innocent," *Murray*, 477 U.S. at 496, then a federal court can excuse the procedural default and review the claim in order to prevent a fundamental miscarriage of justice. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Wenger v. Frank*, 266 F.3d 218, 224 (3d Cir. 2001). The miscarriage of justice exception applies only in extraordinary cases, and actual innocence means factual innocence, not legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623 (1998); *Murray*, 477 U.S. at 496. A petitioner establishes actual innocence by asserting "new reliable evidence - whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - - that was not presented at trial," showing that no reasonable juror would have voted to find the petitioner guilty beyond a reasonable doubt. *Hubbard v. Pinchak*, 378 F.3d 333, 339-40 (3d Cir. 2004).

10

## B. Standard of Review

If the state's highest court adjudicated a federal habeas claim on the merits, then a federal court must review the claim under the deferential standard contained in 28 U.S.C. § 2254(d). A state court has adjudicated a claim on the merits for the purposes of § 2254(d) if the state court "decision finally resolv[es] the parties' claims, with res judicata effect, [and] is based on the substance of the claim advanced, rather than on a procedural, or other ground." *Rompilla v. Horn*, 355 F.3d 233, 247 (3d Cir. 2004)(internal citations omitted), *rev'd on other grounds by Rompilla v. Beard*, 545 U.S. 374 (2005).

Pursuant to § 2254(d), federal habeas relief may only be granted when the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or the state court's decision was an unreasonable determination of the facts based on the evidence adduced in the trial. 28 U.S.C. § 2254(d)(1) & (2); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001). AEDPA also requires a federal court to presume that a state court's determinations of factual issues are correct. 28 U.S.C. § 2254(e)(1). A petitioner can only rebut this presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003)(stating that the clear and convincing standard in § 2254(e)(1) applies to factual issues, whereas the unreasonable application standard of § 2254(d)(2) applies to factual decisions). This presumption of correctness applies to

11

both explicit and implicit findings of fact. *Campbell v. Vaughn*, 209 F.3d 280, 286 (3d

Cir. 2000).

## IV. DISCUSSION

Petitioner asserts a total of fifteen grounds for relief:

1. The police officers' warrantless search of Andrus' home violated his Fourth Amendment rights.

2. The police obtained evidence from Andrus' home and seized petitioner without a warrant or probable cause, thereby violating petitioner's Fourth Amendment rights.

3. The admission of evidence obtained by a non-consensual seizure and detention without probable cause violated the Delaware Constitution.

4. Petitioner's confession was obtained in violation of his right against self-incrimination and in violation of *Miranda v. Arizona*, 348 U.S. 436 (1966).

5. Petitioner's conviction was unconstitutionally obtained by using his involuntary confession.

6. The admission into evidence of Andrus' statement to the prosecution's witness Robert Richmond, without any limiting jury instruction, violated the Confrontation Clause under *Bruton v. United States*, 391 U.S. 123 (1968), and such admission was not harmless beyond a reasonable doubt.

7. The Delaware courts denied petitioner his federal constitutional rights as well as his Delaware constitutional rights by determining that the *Bruton* error was harmless beyond a reasonable doubt.

8. The State failed to preserve and/or disclose potentially favorable evidence to petitioner's case in violation of petitioner's federal and Delaware constitutional rights.

9. The Superior Court erroneously permitted the admission into evidence of petitioner's uncharged crimes, bad acts, and bad character without providing a proper limiting instruction.

10. There was insufficient evidence to sustain petitioner's conviction for first degree conspiracy.

11.  The trial court failed to give proper limiting instructions regarding the *Bruton* evidence and petitioner's uncharged crimes, bad acts, and bad character.

12.  The trial court erroneously instructed the jury on the first degree murder charge.

13.  Counsel provided ineffective assistance during petitioner's trial and appeal by failing to assert any of the errors alleged in claims one through twelve.

14.  Trial counsel labored under a conflict of interest and provided ineffective assistance by failing to investigate the facts of the case, by failing to understand evidentiary issues, and by failing to object to jury instructions or request relevant jury instructions.

15.  There was insufficient evidence to support petitioner's conviction for first degree murder.

(D.I. 105) The State asserts that claims one, two, and three are barred by *Stone v.*

*Powell*, 428 U.S. 465 (1976); claims four, five, six, seven, thirteen, and fourteen do not

warrant relief under § 2254(d)(1); the state law portion of claim nine is not cognizable on

federal review and the federal law portion of claim nine is procedurally barred; and

claims eight, ten, twelve, and fifteen are procedurally barred. (D.I. 18; D.I. 108) The

State does not address claim eleven. However, after reviewing petitioner's claims in

conjunction with the state court record and voluminous filings in this proceeding, the

court concludes that the allegations asserted in claim eleven are subsumed by claims six

and nine. Therefore, the court will include the allegations in claim eleven in its review of

claims six and nine.

## A. Claims One and Two:  Barred by *Stone v. Powell*

The State properly argues the Fourth Amendment claims asserted in claims one

and two are not cognizable on federal habeas review under the doctrine established in

*Stone v. Powell*,  428 U.S. 465, 494 (1976).  In *Stone*, the Supreme Court held that

13

federal courts cannot provide habeas review of Fourth Amendment claims if the petitioner had a full and fair opportunity to litigate those claims in the state courts. *Id.*; *See Wright v. West*, 505 U.S. 277, 293 (1992)("We have also held . . . that claims under *Mapp* [alleging evidence obtained in violation of the Fourth Amendment] are not cognizable on habeas as long as the courts have provided a full and fair opportunity to litigate them at trial or on direct review."). A petitioner has had a full and fair opportunity to litigate such claims if the state has an available mechanism for suppressing evidence seized in or tainted by an illegal search or seizure, irrespective of whether the petitioner actually availed himself of that mechanism. *See U.S. ex rel. Hickey v. Jeffes*, 571 F.2d 762, 766 (3d Cir. 1978); *Boyd v. Mintz*, 631 F.2d 247, 250 (3d Cir. 1980); *Petillo v. New Jersey*, 562 F.2d 903, 906-07 (3d Cir. 1977). Conversely, a petitioner has not had a full and fair opportunity to litigate a Fourth Amendment claim and, therefore, avoids the *Stone* bar, if the state system contains a structural defect that prevented the state from fully and fairly hearing his Fourth Amendment claims. *Marshall v. Hendricks*, 307 F.3d 36, 82 (3d Cir. 2002).

The record in this case reveals that petitioner filed a pre-trial motion to suppress evidence pursuant to Delaware Superior Court Rule of Criminal Procedure 41. That Rule 41 motion, however, asserted that evidence should be suppressed due to the warrantless search for, and seizure of, evidence from Andrus' house, not that petitioner's statements to police should be suppressed due to *Miranda* violations. Petitioner blames counsel for failing to raise claims one and two in his suppression motion, and he argues

14

that counsel's ineffective assistance deprived him of a full and fair opportunity to litigate
the Fourth Amendment issues presented in claims one and two.

Whether or not counsel failed to include claims one and two in the Rule 41 motion
has no bearing on whether or not Delaware's system contains a structural defect. As a
result, counsel's performance is immaterial to *Stone*'s "full and fair opportunity" analysis.
*See, e.g., Marshall v. Hendricks*, 307 F.3d 36, 82 (3d Cir. 2002)(holding that "[a]n
erroneous or summary resolution by a state court of a Fourth Amendment claim does
not overcome the [*Stone*] bar.") ; *Gilmore v. Marks*, 799 F.2d 51, 56 (3d Cir. 1986), *cert.
denied*, 479 U.S. 1041 (1987). Moreover, the Superior Court's litigation of petitioner's
other Fourth Amendment issues demonstrates that Delaware's system does not contain
a structural defect that prevented petitioner from litigating the issues raised in claims one
and two. Accordingly, the court will deny claims one and two as barred by *Stone*.

## B. Claim Three: State Law Issue

In claim three, petitioner merely re-asserts claims one and two in state
constitutional terms. Therefore, the court will deny claim three for failing to present a
cognizable issue on federal habeas review. *See* 28 U.S.C. § 2254; *Engle v. Isaac*, 456
U.S. 107, 119 (1982).

## C. Claims Four and Five: *Miranda* Violations

In claim four, petitioner asserts that the Superior Court erred in admitting into
evidence the confession he gave to police because the police provided an incomplete,
inadequate, and "twisted" *Miranda* warning prior to taking his confession. Petitioner
contends that it took Detective Watson less than one minute to recite the *Miranda*

15

warning, and that Detective Watson failed to inform him that he had the right to remain silent, that anything he said could be used against him, that he had the right to an attorney prior to and during questioning, and that an attorney would be appointed for him if he could not afford one. (D.I. 137 at p.30)

In claim five, petitioner contends that his confession was involuntary because he did not freely and voluntarily waive his *Miranda* rights. More specifically, petitioner asserts that the "police exploited [his] painful physical injuries and weakened mental facilities using the 'inherently coercive' nature of a lengthy incommunicado detention coupled with improper interrogation tactics and mistreatment . . . lengthy and prolonged questioning, badgering, pestering, trickery and deceit, intimidation and credible threats, physical punishment, psychological pressure, lack of counsel's presence." (D.I. 105 at Ground Five)

Petitioner presented these *Miranda* claims to the Delaware Superior Court in his Rule 41 suppression motion. Petitioner argued that the six statements he gave to the police at the New Castle County Police Headquarters on April 5, 1995 should be suppressed because he was in custody from the time he entered the police station, and there was no objective evidence to support the police's claim that they had given him his *Miranda* warnings before conducting the interviews occurring subsequent to 2:09 p.m. After conducting a hearing, the Superior Court judge found that petitioner was not in custody during his first three interviews, so that the police were not required to provide the *Miranda* warnings. The Superior Court judge further found that the police warned petitioner of his *Miranda* rights at the beginning of the fourth interview (2:09 p.m.), and

16

that he knowingly, voluntarily, and intelligently waived those rights. *State v. Andrus*, 1996 WL 190031, at \*5-\*8 (Del. Super. Ct. Jan. 16, 1996). Based on these findings, the Superior Court denied petitioner's suppression motion. *Id.*

On direct appeal, petitioner argued that the Superior Court erred in concluding that the *Miranda* warning was sufficient and that the Superior Court mistakenly concluded that petitioner's statement to the police was the product of a voluntary, knowing, and intelligent waiver of his *Miranda* warnings. The Delaware Supreme Court concurred with the Superior Court's reasoning for denying the suppression motion, and ultimately affirmed petitioner's conviction and sentence. Given the Delaware Supreme Court's adjudication of claims four and five, petitioner can only obtain habeas relief if the Delaware Supreme Court's decision was either contrary to, or an unreasonable application of, clearly established Federal law.

Pursuant to the Supreme Court decision in *Miranda v. Arizona*, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Law enforcement officers must warn a person in custody prior to questioning that he has a right to remain silent, that anything he says may be used against him as evidence, and that he has the right to the presence of an attorney, either retained or appointed. *Id.* at 441, 444. Nevertheless, the Supreme Court "has never indicated that the 'rigidity' of *Miranda* extends to the precise formulation of the warnings given a criminal defendant." *California v. Prysock*, 453 U.S. 355, 359 (1981). "The

17

inquiry is simply whether the warnings reasonably conve[y] to [a suspect] his rights as required by *Miranda*." *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989)(brackets in original).

In addition, a defendant may waive his *Miranda* rights if the waiver is voluntary, intelligent, and knowing. *Miranda*, 384 U.S. at 444. The Supreme Court has articulated a two-pronged test for determining the validity of a *Miranda* waiver:

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986). "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* In analyzing the "totality of the circumstances," a court must look at the facts of the particular case, "including police coerciveness, the length, location and continuity of the interrogation, the defendant's maturity, education, and physical and mental health, and the failure, if any, of the police to advise the defendant of his rights." *United States v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994).

Here, when the Delaware Supreme Court rejected petitioner's *Miranda* claims on direct appeal, it relied on the reasons provided by the Superior Court for denying petitioner's pre-trial suppression motion. *See Fogg*, 1998 WL 736331, at *4. The Superior Court applied *Miranda* and *Moran* in deciding to deny petitioner's motion to suppress. Therefore, as an initial matter, the court concludes that the Delaware

18

Supreme Court's decision regarding claims four and five was not contrary to clearly established Federal law. *See Williams*, 529 U.S. at 406 ("[A] run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause").

The court must next determine if the Delaware Supreme Court's decision involved an unreasonable application of clearly established Federal law. Because the Delaware Supreme Court relied on the reasoning provided by the Superior Court in denying the suppression motion, the court again turns to that decision and the record pertaining to the Superior Court's denial of the suppression motion in conducting its analysis under § 2254(d). *See, e.g., Fahy v. Horn*, 516 F.3d 169, 194 (3d Cir. 2008)( "the appropriate focus of habeas corpus review is the suppression hearing conducted in the state trial court and the finding of facts made by the court before denying the motion to suppress").

### 1. Claim four

The issue presented in claim four is whether Detective Watson provided petitioner with a sufficient *Miranda* warning prior to taking petitioner's confession in the interviews occurring after 2:09 p.m. During the Rule 41 suppression hearing, Detective Watson explained that he had expected his reading of the *Miranda* warnings to be recorded, but discovered later on that his reading of the warnings had not been recorded because there was a problem with the tape. However, Detective Watson described the notations he made in his handwritten notes about providing the warnings, explaining how he read petitioner the *Miranda* rights off the form that had been used with Andrus. Detective McLaren, who was present in the room at the time of this interview, corroborated

19

Detective Watson's testimony. (D.I. 24, App. to State's Ans. Br., Vol. A., in *Fogg v. State*, No.325,1996, dated April 30, 1997, at B-141 to B-147)   Based on the evidence provided during the suppression hearing, the Superior Court judge held that Detective Watson provided petitioner with a sufficient *Miranda* warning and, therefore, denied petitioner's suppression motion to the extent the motion challenged the substance of the *Miranda* warnings. *State v. Andrus, Fogg*, 1996 WL 190031 (Del. Super. Ct. Jan 15, 1996).

After reviewing the record, the court concludes that the Delaware Supreme Court did not unreasonably apply *Miranda* in affirming the Superior Court's decision.  First, absent clear and convincing evidence to the contrary, a federal court must defer to a state court's factual determinations, including those involving credibility issues.  28 U.S.C. 2254(e)(1); *Miller v. Fenton*, 474 U.S. 104, 114 (1985).  Here, the Superior Court judge presiding over the suppression hearing found the testimony of the police officers to be credible, and petitioner has not presented any clear and convincing evidence in this proceeding to rebut that factual determination.

In addition, the transcript of the suppression hearing reveals that Detective Watson read petitioner the following *Miranda* warning to petitioner off of Andrus' *Miranda* card:

> You have the right to remain silent.  Anything you say can and will be used against you in a court of law.  You have the right to talk to a lawyer and have him present with you while you're being questioned.  If you cannot afford a lawyer, one will be appointed to represent you before any questioning if you wish one.  If at any time during this interview, you wish to discontinue your statement, you have the right to do so.

20

(D.I. 24, April 5, 1995 Statement of Daryl Andrus, at p. 3, in *Fogg v. State*, App. to Appellant's Op. Suppl. Memorandum, dated Oct. 17, 2002; D.I. 24, App. to State's Ans. Br., Vol. A, in *Fogg v. State*, No.325,1996, Dated Apr. 30, 1997, at B-142) Viewing the detectives' testimony in conjunction with the actual content of the warning read to petitioner, the court finds that the Delaware Supreme Court did not unreasonably apply *Miranda* and its progeny in holding that the warning read to petitioner adequately conveyed his *Miranda* rights. Accordingly, the court will deny claim four.

### 2. Claim five

Petitioner's argument in claim five is that, even if the *Miranda* warning was sufficient, his confession should not have been admitted at trial because it was not the product of a knowing, voluntary, and intelligent waiver of his *Miranda* rights. Whether a defendant voluntarily waived his *Miranda* rights is a mixed question of law and fact, subject to plenary review. *See Alston v. Redman*, 34 F.3d 1237, 1253 (3d Cir. 2002). Consequently, while the court will independently review the constitutionality of the waiver, it will apply § 2254(d)'s statutory presumption of correctness to the state court's underlying factual conclusions if they are fairly supported by the record. *Id.*

At his suppression hearing, petitioner argued that his waiver was involuntary because the police exploited his weakened mental state: he was impaired from excessive drinking the previous night; he had had inadequate sleep for the previous two nights; and he was subjected to repeated interviews during a 15-hour period in the police station. Detectives Watson and McFarlen testified at the hearing and explained in detail

21

the sequence of events with respect to their interviews of petitioner. Petitioner did not

testify at the suppression hearing.

In its written decision, the Superior Court applied the two-pronged test articulated

in *Moran* and denied the suppression motion. Analyzing petitioner's argument under the

first prong of the *Moran* test, the Superior Court judge explained that,

> while the 15 hours [of interrogation] is a somewhat lengthy period of time, [petitioner] was allowed to rest or sleep in between statements, was provided with food and drink and was told to let police know when he needed a break . . . Police did not intimidate or threaten [petitioner]. The behavior of police interrogators, notwithstanding [petitioner's] physical condition resulting from a hangover and lack of meaningful sleep, did not constitute overreaching or coercive conduct. The pertinent parts of the tapes indicate that, although [petitioner] appeared somewhat tired, he was alert, responsive and cooperative and appeared to comprehend the questions put to him and was able to communicate effectively with his interrogators.

*Fogg*, 1996 WL 190031, at *7-*8. As for the second prong of the *Moran* inquiry, the

Superior Court found that petitioner's waiver was knowing and intelligent, because it was

made "only after [petitioner] was warned that he may refuse to talk to police, may refuse

to talk without the assistance of counsel, may terminate conversation at any time, and

that whatever he chooses to say may be used as evidence against him." *Id*. at *8.

The analysis contained in the Superior Court's decision demonstrates that the

state trial court considered the length of the interrogation, petitioner's physical and

mental condition, the behavior and comments of the police, petitioner's education and

intelligence, and his familiarity with police procedures. In short, the Superior Court

looked at the totality of circumstances in concluding that there "was no evidence that

[petitioner's] will was overborne and his capacity for self-determination critically impaired

because of coercive police conduct." *Fogg*, 1996 Wl 190031, at *7.

22

In this proceeding, petitioner has failed to present clear and convincing evidence to rebut the presumption of correctness that has attached to the Superior Court's factual finding that he voluntarily, intelligently, and knowingly waived his *Miranda* rights. Moreover, given the court's prior conclusion that Detective Watson provided an adequate *Miranda* warning, the court rejects petitioner's specious argument that he could not have knowingly waived his *Miranda* rights because he was not given a proper and adequate *Miranda* warning in the first place. Therefore, the court finds that the Superior Court's underlying factual conclusion that petitioner fully understood the nature of the rights being abandoned and the consequences of that abandonment constituted a reasonable determination of the facts in light of the evidence presented during the state court proceedings. In turn, the court concludes that the Delaware Supreme Court's rejection of petitioner's involuntary waiver claim did not involve an unreasonable application of clearly established Federal law. Accordingly, the court will deny claim five for failing to satisfy the requirements of § 2254(d).

## D. Claims Six, Seven, and Eleven: *Bruton* Issues

Prior to trial, petitioner filed a motion to sever his charges from Andrus' charges. The Superior Court denied the motion. Thereafter, during petitioner's joint trial with Andrus, a prosecution witness, Robert Richmond, testified about five out-of-court-conversations he had with Andrus while they were both inmates at Gander Hill; those conversations implicated both Andrus and petitioner in Dilley's murder. According to Richmond, Andrus told him that: Andrus and petitioner kicked and stomped Dilley; petitioner "got way out of hand with it and just went too far"; and the incident occurred in

23

the living room and, afterwards, the two men dragged the victim to the bathroom to clean him up and to clean up the house. (D.I. 24, App. to State's Ans. Br. Vol. A in *Fogg v. State*, No.325,1996, dated Apr. 30, 1997, at B-244-45, B-248-50) Petitioner's statement to the police, in which he admitted hitting Dilley and "spazz[ing] out on him," was also introduced into evidence. *Id.* at B-124, 131. Neither petitioner nor Andrus testified at trial.

Petitioner did not object to Richmond's testimony as violating his confrontation rights pursuant to *Bruton* at trial or in his opening brief on direct appeal. However, after reviewing the appellate briefs presented by both parties, the Delaware Supreme Court sua sponte questioned whether there had been a violation of petitioner's rights under *Bruton*, and remanded petitioner's case to the Superior Court for re-consideration of its decision against severance in light of Richmond's testimony at trial. More specifically, the Delaware Supreme Court directed the Superior Court to consider the effect of Richmond's testimony on the rights of both petitioner and Andrus.

In *Bruton v. United States*, 391 U.S. 123 (1968), the United States Supreme Court held that a defendant is deprived of his rights under the Confrontation Clause when a non-testifying co-defendant's confession naming that defendant as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the co-defendant. *Id.* at 134. However, in *Richardson v. Marsh*, 481 U.S. 200 (1987), the Supreme Court held that the Confrontation Clause permits the use of a non-testifying co-defendant's confession at a joint trial where the jury is given a proper limiting instruction and where the confession is redacted to omit any reference to

the defendant, even though the defendant may be linked to the confession by evidence properly admitted against the defendant at trial. *Id.* at 211. The *Richardson* Court noted that redaction, sufficient to eliminate any reference to the existence of the defendant, is a "more just" alternative than severance. *Id.* On remand, the Superior Court analyzed the issue presented by the Delaware Supreme Court under *Bruton* and *Richardson*, and determined that redaction of Richmond's statement, sufficient to eliminate any reference to the existence of petitioner, was entirely feasible and would have been the more appropriate remedy than severance. (D.I. 24, *State v. Fogg*, Opinion (Del. Super. Ct. Feb. 20, 1998)). Therefore, the Superior Court held that petitioner's motion to sever would have been properly denied in light of the Supreme Court's rulings in *Bruton* and *Richardson*. *Id.*

On appeal after remand, the State acknowledged that the admission of Andrus' statement to Richmond incriminating petitioner violated petitioner's rights under *Bruton*, but argued that the *Bruton* error was harmless. The Delaware Supreme Court concurred, holding that the *Bruton* error "was harmless beyond a reasonable doubt when it is considered in the context of the admissible evidence of [petitioner's] guilt." *Fogg*, 1998 WL 736331, at *4.

In claim six, petitioner contends that the admission into evidence of Andrus' out-of-court statement to Robert Richmond violated the Confrontation Clause under the holding of *Bruton v. United States*, 391 U.S. 23 (1986). In claim seven, petitioner contends that the Delaware State Courts erred by determining that the *Bruton* violation constituted harmless error. Finally, a portion of claim eleven alleges that the Superior

Court erred by failing to give a limiting instruction regarding the *Bruton* evidence. Given the Delaware Supreme Court's holding that the admission of Richmond's statement constituted an error under *Bruton*, as well as the State's concession in this proceeding that the admission of Richmond's statement constituted a violation of *Bruton*, the court will only consider claim seven.[4]

Typically, the court's inquiry under § 2254(d)(1) would require determining whether the Delaware Supreme Court unreasonably applied Federal law in holding the *Bruton* violation in petitioner's case constituted harmless error. However, in *Fry v. Pliler*, the United States Supreme Court recently explained that a habeas court assessing the prejudicial impact of a constitutional error in a state-court criminal trial must apply the harmless-error standard articulated in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993). *Fry v. Pliler*, 127 S.Ct. 2321, 2326-28 (2007)(explaining that the *Brecht* harmless error standard of review subsumes the standards announced in AEDPA). Therefore, the court must determine whether the *Bruton* error that occurred during petitioner's trial had a substantial and injurious effect or influence in determining the jury's verdict. *Brecht*, 507 U.S. at 637-38. Under this standard, petitioner will only be entitled to habeas relief if he demonstrates that the *Bruton* error resulted in "actual prejudice." *Brecht*, 507 U.S. at 637; *Fry*, 127 S.Ct. at 2327.

The evidence admitted at trial included petitioner's statement to the police that he remembered hitting and punching Dilley, and he thought he remembered kicking Dilley

---

[4]The court's conclusion that the *Bruton* error caused by the admission of Richmond's statement without a limiting instruction constituted harmless error eliminates the need to address the petitioner's contention in claim seven that the trial court erred by not providing a limiting instruction for this evidence. *See infra* at pp.27-8.

once or twice, but the details of the night were a "big blurry fuzz." Petitioner explained that he did not want to hurt Dilley that bad, but that he must have "spazzed out on him." Petitioner also stated that he thought Andrus was there. Petitioner described how he woke up the next morning in the living room, and he explained how he and Andrus attempted to clean Dilley up and revive him. Finally, petitioner described that he had had a little fighting training when he was a teenager, which included kicking. (D.I. 24, App. to State's Ans. Br. in *Fogg v. State*, No.325,1996, at B-124 - 134)

The other testimony and evidence admitted at trial revealed that the victim, Dilley, was last seen alive late one night in Andrus' living room in the company of petitioner and Andrus. The next morning, he was found dead and beaten in Andrus' bedroom, with petitioner and Andrus offering no explanations to emergency technicians and police other than they had discovered him in that condition in the bathtub. The walls and carpets of the house were covered with blood, and pieces of Dilley's broken dentures and a tooth were found in the living room, bedroom, bathroom, and hallway. The police identified apparent blood-stained palm prints, lifted from the living room and hallway walls, and the bedroom door, as belonging to petitioner and Andrus. The medical examiner discovered four distinctive patterned injuries on the victim's face and body that corresponded to rings belonging to petitioner and Andrus and to a pair of cowboy boots and a single black boot recovered from Andrus' bedroom. The cowboy boots were identified by a podiatrist as matching casts of Andrus' feet. However, Andrus' former physician testified that Andrus had sustained a gunshot wound in 1994 that had left him partially paralyzed on his right side and in his left leg and, therefore, Andrus would not have had the ability to kick with any force. Nevertheless, the physician testified that

27

Andrus could have performed some of the injuries such as punching and striking with blunt objects or hands.

Viewing Richmond's statement with the aforementioned evidence and, in particular, with petitioner's statement to police, the court concludes that Richmond's statement was cumulative of the other properly evidence admitted during petitioner's trial. Consequently, the *Bruton* violation stemming from the admission of Richmond's statement constituted harmless error because it did not have a substantial or injurious effect or influence in determining the jury's verdict. *See Brown v. United States*, 411 U.S. 223, 231 (1973)(harmless error despite *Bruton* violation where the testimony erroneously admitted was merely cumulative.). Accordingly, the court will deny claims six, seven, and the related portion of claim eleven.

### E. Claims Nine and Eleven: Character Evidence

In claims nine and eleven, petitioner argues that the admission of evidence depicting him as having a bad character, and the trial court's failure to give an appropriate limiting instruction regarding the bad character and prior bad acts evidence, violated his rights under the Due Process Clause. Petitioner raised these issues regarding the admission of prior bad acts and bad character evidence during the Rule 61 remand, specifically arguing that the admission of the evidence regarding petitioner's other fights on the night before Dilley died (via witness Cathell's testimony) and evidence of petitioner's bad acts one day before Dilley's death (via Cheryl Adams' testimony) violated the holding of *Getz v. State*, 538 A.2d 726 (Del. 1988). Petitioner also argued that the trial court erred in failing to give a limiting instruction related to the "prior bad

28

acts" and bad character evidence pursuant to *Getz*. *Fogg*, 2002 WL 31053868, at \*26-27. The Superior Court rejected petitioner's argument and held that the "prior bad acts" evidence was properly admitted under Delaware Rule of Evidence 404(b) and Delaware caselaw because the prior bad act evidence was cumulative to other evidence. *See Fogg*, 2002 WL 31053868, at \* 26-27. The Superior Court also held that the trial judge did not err by failing to sua sponte give a limiting instruction because "there is no requirement of the giving of a contemporaneous limiting instruction in every case involving evidence of other wrongs under [Delaware Rule of Evidence] 404(b) . . . when a trial judge has determined that evidence can be admitted under 404(b)." *Id*. at \*27.

The record reveals that, to the extent petitioner presented the prior bad acts, bad character, and the limiting instruction arguments regarding such evidence, to the Delaware State Courts as independent substantive claims, he presented the issues as violations of Delaware state law rather than as violations of Federal law.[5] Consequently,

---

[5]During the original Rule 61 proceeding and the Rule 61 remand, petitioner argued that counsel provided ineffective assistance of counsel by failing to attempt to limit or prevent the admission of the prior bad acts evidence, and also by failing to request a limiting instruction regarding this evidence. However, after holding that the arguments regarding the prior bad acts and the limiting instruction were meritless under Delaware state law, the Superior Court denied the ineffective assistance of counsel claim because petitioner failed to satisfy either prong of the *Strickland* standard. *See Fogg*, 2002 WL 31053868, at \*27. On appeal after the remand, petitioner argued that counsel provided ineffective assistance by not objecting to the admission of prior bad acts evidence under *Getz*, *DeShields v. State*, 706 A.2d 502 (Del. 1998), and Delaware Rule of Evidence 404(b). (D.I. 24, Appellant's Op. Supp. Mem. in *Fogg v. State*, No.426, 2000, dated Oct. 18, 2002, at pp.12-17)

Even in the ineffective assistance of counsel claim presented to the Delaware State Courts, petitioner argued that counsel's actions with respect to the prior bad acts evidence and the limiting instruction violated Delaware law and, therefore, constituted ineffective assistance. Thus, the court finds that the presentation of these two substantive state law arguments within the ineffective assistance of counsel claim did not satisfy the "fair presentation" component of the exhaustion doctrine.

petitioner has not exhausted state remedies for claims nine and eleven because he did not "fairly present" the claim to the state courts as an issue of Federal law. *See McCandless*, 172 F.3d at 261(a habeas petition must "present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted.").

At this juncture, Delaware Superior Court Criminal Rules 61(i)(2) and 61(i)(3) would bar petitioner from presenting claims nine and eleven to the Delaware state courts in a new Rule 61 motion, thereby precluding petitioner from obtaining review of the claims in any subsequent appeal to the Delaware Supreme Court. *See Lawrie v. Snyder*, 9 F. Supp. 2d 428, 453 (D. Del. 1998)(Rule 61(i)(2) bars any ground for relief that was not asserted in a prior proceeding); *Bright v. Snyder*, 218 F. Supp. 2d 573, 580 (D. Del. 2002)(Rule 61(i)(3) would bar the Superior Court from considering the claim because petitioner did not raise the claim in the proceedings leading to his conviction). As a result, the court must excuse petitioner's failure to exhaust state remedies for claim nine, but still treat the claim as procedurally defaulted. Thus, the court cannot review the merits of claim nine (and the corresponding portion of claim eleven) absent a showing of cause and prejudice, or that a miscarriage of justice will occur absent such review.

Here, petitioner blames counsel for failing to preserve these issues in an attempt to establish cause for his default of claims nine and eleven. It is well-settled that an attorney's failure to raise or preserve a claim can constitute cause for the default of that

---

And finally, the court notes that it does consider the independent ineffective assistance of counsel claim involving the prior bad acts and bad character evidence and the limiting instruction in the text of its opinion. *See infra* at pp. 34-38.

claim, provided that the attorney's ineffective assistance rises to the level of a Sixth Amendment violation. As explained later in this opinion, the court concludes that counsel did not provide constitutionally ineffective assistance by failing to raise the issue of prior bad acts or bad character evidence or by failing to request a limiting instruction with respect such evidence. *See infra* at pp. 34-38. Therefore, petitioner has not demonstrated cause for his default.

In the absence of cause, the court will not address the issue of prejudice. Moreover, petitioner has not satisfied the miscarriage of justice exception to the procedural default doctrine because he has not provided evidence of his actual innocence. Accordingly, the court will deny claim nine, and the related portion of claim eleven, as procedurally barred.

## F. Claims Eight, Ten, Twelve, and Fifteen: Procedurally Barred

The record reveals that petitioner did not exhaust state remedies for claims eight, ten, twelve, and fifteen, because he did not present them to the Delaware Supreme Court in either his direct appeal or on post-conviction appeal. Any attempt by petitioner to raise these four issues in a new post-conviction proceeding would be procedurally barred under Delaware Superior Court Criminal Rule 61(i).[6] In these circumstances, the court must treat the claims as exhausted but procedurally defaulted. Therefore, the

_____

[6]A new Rule 61 motion would be time-barred under Rule 61(i)(1), barred as repetitive under Rule 61(i)(2), and procedurally defaulted under Rule 61(i)(3). *See Lawrie v. Snyder*, 9 F. Supp. 2d 428, 453 (D. Del. 1998)(Rule 61(i)(2) bars any ground for relief that was not asserted in a prior proceeding); *Bright v. Snyder*, 218 F. Supp. 2d 573, 580 (D. Del. 2002)(Rule 61(i)(3) would bar the Superior Court from considering the claim because petitioner did not raise the claim in the proceedings leading to his conviction).

court cannot review the merits of the claims absent a showing of cause and prejudice, or a miscarriage of justice.

Petitioner attempts to establish cause for his default of these four claims by blaming counsel. However, the record reveals that petitioner never raised the issue of counsel's performance with respect to these four substantive claims to the Delaware Supreme Court on post-conviction appeal. Consequently, these ineffective assistance of counsel allegations are themselves procedurally defaulted, See Del. Super. Ct. Crim. Rule 61(i)(2), and cannot excuse petitioner's procedural default of the four substantive claims. See Edwards v. Carpenter, 529 U.S. 446, 453-54 (2000).

The court has sifted through petitioner's voluminous filings and has not found any other attempt to establish cause for petitioner's default of claims eight, ten, twelve, and fifteen. In the absence of cause, the court will not address the issue of prejudice. Moreover, the miscarriage of justice exception to the procedural default doctrine does not excuse petitioner's default because he has not provided new reliable evidence of his actual innocence. Accordingly, the court will dismiss claims eight, ten, twelve, and fifteen as procedurally barred.

## G. Claims Thirteen and Fourteen: Ineffective Assistance of Counsel

In claim thirteen, petitioner contends that counsel provided ineffective assistance during the trial and on appeal by failing to assert the errors alleged in his habeas claims one through twelve. In claim fourteen, petitioner contends that trial counsel provided ineffective assistance by failing to investigate facts, by laboring under a conflict of interest, by failing to research law, by failing to object to jury instructions, and by failing to object to inadmissible evidence.

32

After reviewing petitioner's voluminous filings in the state court record and in this proceeding, the court makes the following findings. First, petitioner has not exhausted state remedies for the allegations in claim thirteen regarding counsel's failure to raise the errors contained in claims one, two, three, four, five, eight, ten, twelve, and fifteen because he never presented these particular errors by counsel to the Delaware Supreme Court on post-conviction appeal. The court also finds that, aside from the issue of jury instructions, petitioner did not exhaust state remedies for the general complaints related to counsel's performance asserted in claim fourteen. In contrast, the record reveals that petitioner exhausted state remedies for his ineffective assistance of counsel claims concerning claims six, seven, nine, and eleven. Petitioner also exhausted state remedies for his claim that trial counsel provided ineffective assistance by failing to object to the jury instructions given, or request changes or additional instructions, to the extent this claim asserts that counsel failed to request accomplice liability instructions and limiting instructions for the bad character/acts evidence. Therefore, the court will consider the unexhausted claims separately from the exhausted claims.

### 1. Unexhausted claims

At this juncture, petitioner is time-barred from presenting the aforementioned unexhausted ineffective assistance of counsel claims to the Delaware State Courts in a new Rule 61 motion. *See* Del. Super. Ct. Crim. R. 61(i)(1). Thus, the claims are procedurally defaulted, meaning that the court cannot review the merits of these ineffective assistance of counsel claims absent cause and prejudice, or a miscarriage of justice.

33

Petitioner does not allege, and the court cannot discern, that any external impediment prevented him from raising these particular allegations regarding counsel's performance. To the extent petitioner has implicitly alleged that his post-conviction counsel failed to raise these allegations in his state collateral proceeding, any alleged ineffective assistance on the part of post-conviction counsel cannot constitute cause for petitioner's default. *See Johnson v. Pinchak*, 392 F.3d 551, 563 (3d Cir. 2004)(ineffective assistance of post-conviction counsel cannot constitute cause because the Sixth Amendment does not entitle a defendant to post-conviction counsel).

In the absence of cause, the court will not address the issue of prejudice. In addition, petitioner has not provided new reliable evidence of his actual innocence, thereby precluding the court from reviewing the claims under the miscarriage of justice exception to the procedural default doctrine. Thus, the court will deny as procedurally barred the ineffective assistance of counsel claims related to claims one, two, three, four, five, eight, ten, twelve, fifteen, as well as all but one of the general allegations contained in claim fourteen.

### 2. Exhausted claims

During the Rule 61 remand, petitioner argued that counsel provided ineffective assistance for failing to raise the *Bruton* errors asserted in claims six and seven, and also for failing to request limiting instructions with respect to the evidence that was admitted in violation of *Bruton* (claim eleven). Petitioner also argued to the Superior Court that counsel provided ineffective assistance by failing to raise the errors asserted in claim nine and the related portion of claim eleven regarding the lack of limiting

34

instructions. And finally, petitioner argued that trial counsel provided ineffective assistance by failing to request a jury instruction on accomplice liability. The Superior Court denied these claims as meritless, and the Delaware Supreme Court affirmed that judgment "for the reasons set forth in the Superior Court's decision." Therefore, petitioner will only be entitled to habeas relief for these claims if the Delaware Supreme Court's decision was either contrary to, or an unreasonable application of, clearly established Federal law. 28 U.S.C. § 2254(d)(1).

The "clearly established [f]ederal law" which governs ineffective assistance of counsel claims is the two-pronged standard enunciated by *Strickland v. Washington*, 466 U.S. 668 (1984) and its progeny. *See Wiggins v. Smith*, 539 U.S. 510 (2003). To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate both that: (1) counsel's performance fell below an objective standard of reasonableness measured under prevailing professional norms; and (2) counsel's deficient performance actually prejudiced the petitioner's case. *Strickland*, 466 U.S. at 690. In order to sustain an ineffective assistance of counsel claim, a petitioner must make concrete allegations of actual prejudice and substantiate them or risk summary dismissal. *See Wells v. Petsock*, 941 F.2d 253, 259-260; *Dooley*, 816 F.2d at 891-92. Although not insurmountable, the *Strickland* standard is highly demanding and leads to a "strong presumption that the representation was professionally reasonable." *Strickland*, 466 U.S. at 689.

Here, the Superior Court correctly identified the *Strickland* standard and analyzed the instant ineffective assistance of counsel claims within its framework. The Delaware

Supreme Court adopted the Superior Court's reasoning. Therefore, the Delaware Supreme Court's denial of these ineffective assistance of counsel claims was not contrary to clearly established Supreme Court precedent. *See Williams*, 529 U.S. at 406 ("[A] run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause").

The court must also determine whether the Delaware Supreme Court's analysis of the claims constituted an unreasonable application of the *Strickland* standard. As previously explained, the *Bruton* error relating to the admission of Richmond's statement constituted harmless error. Consequently, petitioner cannot demonstrate that he was prejudiced by counsel's failure to raise the *Bruton* violations or that he was prejudiced by the failure to give limiting instructions with respect to a *Bruton* violation which constituted harmless error. Thus, the court concludes that the Delaware Supreme Court reasonably applied *Strickland* in denying petitioner's claims regarding counsel's failure to raise the issues presented in claims six, seven, and eleven.

Next, the court considers petitioner's ineffective assistance of counsel allegations regarding the issues raised in claim nine and the related portion of claim eleven. In petitioner's state collateral proceeding, the Superior Court held that the admission of petitioner's prior bad acts and bad character evidence did not violate Delaware evidentiary law and, therefore, petitioner was not prejudiced by counsel's failure to object to such evidence. The Superior Court also held that the trial court did not commit any

36

error by not providing a limiting instruction for this evidence, nor was counsel required to request such a limiting instruction.

A federal habeas court is required to accept a state court's interpretation of state law. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). Additionally, it is well-settled that an attorney does not provide ineffective assistance by failing to raise improper or meritless claims. *See Werts v. Vaughn*, 228 F.3d 178, 203 (3d Cir. 2000). Given the Delaware State Courts' conclusion that the admission of petitioner's prior bad acts and bad character evidence did not constitute an error under Delaware evidentiary law, petitioner cannot demonstrate how he was prejudiced by counsel's failure to raise meritless objections to the admission of such evidence. In turn, considering that an objection to the prior bad acts/bad character evidence would have been non-meritorious, the Delaware State Courts reasonably concluded that counsel's decision not to request a limiting instruction was a tactical decision designed to de-emphasize the evidence. Accordingly, the court concludes that petitioner's ineffective assistance of counsel claims relating to the errors asserted in claims nine and eleven do not warrant relief under § 2254(d)(1).

Finally, turning to petitioner's allegations regarding counsel's failure to request an accomplice liability instruction, trial counsel testified during the Rule 61 proceeding that he did not request an accomplice liability instruction because "there was a vicarious liability between the two defendants," and the trial court had "provided . . . jury instructions that included lesser-includeds," which counsel believed "took care of the issue." *Fogg*, 2002 WL 31053868, at *30. The Superior Court held that counsel's choice not to request a jury instruction on accomplice liability did not constitute

37

ineffective assistance because the State prosecuted petitioner and Andrus on a theory of conspiratorial liability, rather than accomplice liability, and the practical effect of the jury instructions provided on conspiratorial liability and degrees of culpability were akin to the effect of any accomplice liability instruction that could have been given. *Id.* at \*30-31. Deferring, as it must, to the Delaware State Court's interpretation and application of Delaware law, the court concludes that counsel did not perform deficiently by failing to request an accomplice liability instruction that would have had the same effect as the jury instruction actually provided. Therefore, the Delaware Supreme Court did not unreasonably apply *Strickland* in denying the instant claim. Accordingly, the court will deny this portion of claim fourteen for failing to satisfy the requirements of § 2254(d)(1).

## V. CERTIFICATE OF APPEALABILITY

Before closing, the court must decide whether to issue a certificate of appealabilty. *See* Third Circuit Local Appellate Rule 22.2. The court may issue a certificate of appealability only when a petitioner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This showing is satisfied when the petitioner demonstrates "that reasonable jurists would find the district court's assessment of the denial of a constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Further, when a federal court denies a habeas petition on procedural grounds without reaching the underlying constitutional claim, the prisoner must demonstrate that jurists of reason would find it debatable: (1) whether the petition states a valid claim of

38

the denial of a constitutional right; and (2) whether the court was correct in its procedural ruling. *Slack*, 529 U.S. at 484.

For the reasons stated above, the court concludes that petitioner's habeas application must be denied. Reasonable jurists would not find this conclusion debatable. Consequently, a certificate of appealability will not be issued.

## VI. CONCLUSION

For foregoing reasons, the court will deny petitioner's application for habeas relief filed pursuant to 28 U.S.C. § 2254.

An appropriate order will be entered.